# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### NORTHERN DIVISION

JERETTA JENNINGS,       )
                                   )
            Plaintiff,          )
                                   )
              v.                )       No. 2:13 CV 73 JCH/DDN
                                   )
CAROLYN W. COLVIN,       )
Commissioner of Social Security,     )
                                   )
           Defendant.       )

## REPORT AND RECOMMENDATION

This action is before the court for judicial review of the final decision of the defendant Commissioner of Social Security denying the application of plaintiff Jeretta Jennings for disability insurance benefits under Title II of the Social Security Act (the Act), 42 U.S.C. § 401, et seq. The action was referred to the undersigned United States Magistrate Judge for review and a recommended disposition under 28 U.S.C. § 636(b). For the reasons set forth below, the decision of the Administrative Law Judge should be affirmed.

## I.  BACKGROUND

Plaintiff Jeretta Jennings, born July 29, 1964, applied for Title II benefits on February 4, 2011. (Tr. 145-51.) She initially alleged an onset date of disability of September 29, 2009,[1] due to back pain, anxiety, bilateral shoulder pain, irritable bowel syndrome, right eye vision impairment, torn left knee cartilage, spinal cord damage, allergies, inability to sit and stand for long periods, and right hip buckling. (Tr. 169.) Plaintiff's application for Title II benefits was denied initially on April 21, 2011, and she requested a hearing before an ALJ. (Tr. 94-102.)

On January 23, 2012, following a hearing, the ALJ found plaintiff not disabled. (Tr. 10-20.) On June 10, 2013, the Appeals Council denied plaintiff's request for review. (Tr. 1-3.) Thus, the decision of the ALJ stands as the final decision of the Commissioner.

---

[1] During her evidentiary hearing, the Administrative Law Judge noted that at that time plaintiff alleged an onset date of April 6, 2010. (Tr. 30.)

## II. MEDICAL HISTORY

On June 11, 2009, plaintiff complained of left knee pain that began six months earlier. She reported that lying flat exacerbated the left knee pain and that the pain prevented sleep. Left knee X-rays revealed no abnormalities. Julia Knapp, FNP, assessed left knee pain. Her medications included HyoMax SR, Allegra D, and Xanax.[2] (Tr. 251, 359.)

On June 22, 2009, plaintiff complained of coughing, congestion, and sore throat. Dr. B. Kevin Knowles assessed upper respiratory infection. (Tr. 312.)

On June 26, 2009, plaintiff complained of right shoulder pain. Dr. Knowles assessed right rhomboid strain and thoracic strain and prescribed Darvocet and a rhomboid injection.[3] (Tr. 311.)

On July 2, 2009, Matt Thornburg, M.D., assessed left knee pain, degenerative meniscal injury, and questionable chronic ACL injury. He injected Marcaine, Lidocaine, and Kenalog.[4] (Tr. 389.)

On October 9, 2009, plaintiff complained of sinus pressure, earache, and sore throat. (Tr. 310.)

On October 28, 2009, plaintiff complained of sinus infection and sore throat that began three weeks earlier. Nurse practitioner Knapp assessed acute upper respiratory infection and cough and prescribed Zithromax and Proventil.[5] (Tr. 358.)

---

[2] HyoMax is used to treat stomach and intestinal problems, including cramps and irritable bowel syndrome. WebMD, http://www.webmd.com/drugs (last visited on March 18, 2014). Allegra is used to relieve allergy symptoms. Id. Xanax is used to treat anxiety and panic disorders. Id.

[3] Darvocet was used to treat pain. WebMD, http:// www.webmd.com/painmanagement /news/20101119/darvon-darvocet-banned (last visited March 18, 2014).

[4] Marcaine and Lidocaine are local anesthetics. WebMD, http://www.webmd.com/drugs (last visited on March 18, 2014). Kenalog is a corticosteroid that reduces symptoms such as swelling and allergic-type reactions. Id.

[5] Zithromax is an antibiotic. WebMD, http://www.webmd.com/drugs (last visited on March 18, 2014). Proventil is used to treat wheezing and shortness of breath caused by breathing problems. Id.

On December 4, 2009, plaintiff complained of a sinus infection and ear pain. She reported that severe sinus infections began two years earlier. She received a diagnosis of acute chronic sinusitis and prescriptions for Decadron, prednisone, and Levaquin.[6] (Tr. 255-56.)

On December 14, 2009, plaintiff complained of chronic sinus problems. She reported that she smoked a pack of cigarettes per day. Kelly D. Burchett, D.O., assessed tobacco use, chronic sinusitis, and turbinate hypertrophy and prescribed Augmentin.[7] (Tr. 260-61.)

On December 24, 2009, plaintiff complained of intermittent aching and floaters in both eyes. (Tr. 329.)

On January 13, 2010, plaintiff reported no changes regarding chronic sinusitis. Dr. Burchett recommended a sinus CT scan. (Tr. 263-64.)

On January 21, 2010, a sinus CT scan revealed a left middle turbinate concha bullosa. (Tr. 271-72.)

On January 27, 2010, Dr. Burchett assessed headache, muscle tension, and concha bullosa. She encouraged plaintiff to stop tobacco and caffeine use and recommended osteopathic manipulation for cervical and thoracic strain. (Tr. 265-67.)

On February 18, 2010, a cervical spine MRI revealed high grade spinal stenosis at C5-6 and C6-7 and central and paracentral stenosis. Plaintiff also received a spinal injection of Kenalog. (Tr. 399-400.)

On March 16, 2010, plaintiff complained of her left knee and neck and received a Synvisc injection.[8] Dr. Thornburg diagnosed left knee degenerative joint disease and multilevel cervical degenerative disk disease. Plaintiff planned to seek laser treatment in Philadelphia. (Tr. 390.)

On March 18, 2010, plaintiff received osteopathic manipulative medicine and reported improvement regarding pain. Michael J. Chase, D.O., assessed spinal stenosis at C5-6 and C6-7

---

[6] Decadron and prednisone are corticosteroids that reduce symptoms such as swelling and allergic-type reactions. WebMD, http://www.webmd.com/drugs (last visited on March 18, 2014). Levaquin is an antibiotic. Id.

[7] Augmentin is an antibiotic. WebMD, http://www.webmd.com/drugs (last visited on March 18, 2014).

[8] Synvisc is used to treat knee pain in patients with joint inflammation. WebMD, http://www.webmd.com/drugs (last visited on March 18, 2014).

and scheduled cervical spine surgery for early April.[9]  He also assessed neck pain and thoracic spine pain.  (Tr. 379.)

On March 26, 2010, plaintiff received osteopathic manipulative medicine.  She reported improvement with her back pain since starting treatment, and Dr. Chase observed improved range of motion.  (Tr. 377-78.)

Also on March 26, 2010, plaintiff registered as a patient at the Laser Spine Institute.  (Tr. 564-68.)

On March 31, 2010, plaintiff received osteopathic manipulative medicine and reported improvement with her pain and increased range of motion.  Dr. Chase assessed neck pain and back pain.  (Tr. 375-76.)

On April 6, 2010, plaintiff complained of neck pain, right shoulder and arm pain, bilateral arm and hand weakness, numbness and tingling, and headaches.  X-ray scans revealed severe discogenic disease, bony spondylosis, and bony neural foraminal encroachment at the mid and lower cervical levels.  Robert Davis assessed cervical spine pain with radiculopathy, cervicalgia, pain in limb, disturbance of skin sensation, and pain in the shoulder joint.  (Tr. 274, 283-88.)

On April 7, 2010, plaintiff discussed laser surgery on her spine, involving laminotomy, foraminotomy, and decompression of the nerve root at C6-7 and facet thermal ablation at C3-4, C4-5, and C5-6.  Robert Davis prescribed Bactrim DS and Percocet.[10]  (Tr. 289-90.)

On April 14, 2010, physician assistant Wildman recommended a myelogram and CT scan of the cervical spine and a neurology consultation.[11]  He also informed plaintiff that she required operative intervention.  (Tr. 391.)

---

[9] The human spinal column consists of thirty-three vertebrae.  There are seven cervical vertebrae (denoted C1-C7), twelve thoracic vertebrae (denoted T1-T12), five lumbar vertebrae (denoted L1-L5), five sacral vertebrae (denoted S1-S5 and fused together into one bone, the sacrum), and four coccygeal vertebrae (fused together into one bone, the coccyx).  The cervical vertebrae form part of the neck, while the lumbar vertebrae form part of the lower back.  The sacrum is immediately below the lumbar vertebrae.  Stedman's Medical Dictionary, 22117-18 (28th ed., Lippincott Williams & Wilkins 2006).

[10] Bactrim is an antibiotic.  WebMD, http://www.webmd.com/drugs (last visited on March 18, 2014).  Percocet is used to relieve moderate to severe pain.  Id.

On April 19, 2010, a CT scan of the cervical spine revealed multilevel spinal stenoses[12] at C3-C7 and moderate encroachment of the spinal canal at T2-T3. Myelography revealed high grade spinal stenosis at C5-6 and C6-7. (Tr. 337-40.)

On April 26, 2010, plaintiff complained of a sore throat and cough. Dr. Knowles diagnosed pharyngitis and prescribed Augmentin. (Tr. 309.)

On April 28, 2010, plaintiff complained of increasing problems with neck and shoulder pain, headaches, and significant cervical spine disease. Robin B. Blount, M.D., noted her scheduled multilevel anterior cervical discectomy and fusion and performed a preoperative examination. Chest X-rays revealed no acute pulmonary process. Dr. Blount assessed cervical arthritis and disc disease, probable chronic obstructive pulmonary disease, acid reflux disease, and spastic colon and found no obstacles to the planned procedure. She also recommended nebulizer treatment and that plaintiff discontinue smoking. (Tr. 293-97.)

On May 4, 2010, plaintiff underwent an anterior cervical discectomy and fusion from C3 to C7. Plaintiff reported that her back and right shoulder pain began in May 2009 following ATV accident. She further reported that the Laser Spine Institute indicated that she was not a candidate for laser surgery. She complained of sleep disturbance, clumsiness, occasional stumbling, and numbness and tingling in both hands due to carpal tunnel syndrome surgery. She reported that she was a professional singer, and physician assistant Wildman informed her that the surgery could cause a permanently hoarse voice. On May 6, 2010, plaintiff was discharged. (Tr. 298-306.)

On May 18, 2010, plaintiff reported that her range of motion began to recover but complained of severe pain and insomnia. She received prescriptions for Vicodin following the surgery.[13] She further expressed a strong desire to discontinue smoking. Dr. Chase assessed neck

---

[11] A myelogram uses X-rays and contrast material to examine the bones and the fluid-filled space between the bones in the spine. WebMD, http://www.webmd.com/back-pain/myelogram-16147 (last visited March 18, 2014).

[12] A stenosis is a narrowing of the spinal canal. WebMD, http://www.webmd.com/back-pain/lumbar-spinal-stenosis-topic-overview. (last visited June 9, 2014).

[13] Vicodin is used to relieve moderate to severe pain. WebMD, http://www.webmd.com/drugs (last visited on March 18, 2014).

pain, status post cervical fusion, insomnia, and tobacco abuse. She prescribed Vicodin and Chantix and replaced Xanax with Seroquel.[14] (Tr. 373-74.)

On June 10, 2010, plaintiff complained of a sore throat, coughing, diarrhea, headaches, right earaches, and congestion. She received an assessment of upper respiratory infection and a prescription for Xanax. (Tr. 371-72.)

On June 29, 2010, plaintiff requested an increase of Xanax due to her recent surgery and the poor health of her mother-in-law. Dr. Knowles assessed anxiety and increased her dosage of Xanax. (Tr. 308.)

On July 7, 2010, plaintiff reported that she had no arm pain and that her voice returned and she could sing. She planned to return to work in one to two weeks. Dr. Cunningham found her postoperative recovery satisfactory. (Tr. 393.)

On August 27, 2010, plaintiff received a spinal injections of Kenalog. (Tr. 335-36.)

On October 26, 2010, plaintiff reported improved pain since her spinal decompression and fusion but complained of residual cervicalgia. Jeffrey M. Tiede, M.D., assessed status post spinal fusion and residual myofascial cervicalgia and prescribed Tylenol 3 and tizanidine.[15] (Tr. 419-21.)

On November 10, 2010, plaintiff complained of constant aching knee pain, accompanied by occasional popping, catching, and swelling. She reported that walking, sitting, climbing stairs, kneeling, and squatting caused pain and that she received therapy for her neck and uses a bone stimulator. She reported that she worked as a waitress. Physician assistant Wildman's impression was left knee medial meniscus tear. (Tr. 394.)

On November 19, 2010, plaintiff complained of neck pain and reported that she continued to smoke cigarettes. Dr. Cunningham observed that the discs at C7-T1 had further degenerated. He recommended a CT scan and myelogram of her neck. (Tr. 395.)

---

[14] Chantix is used as a smoking cessation aid. WebMD, http://www.webmd.com/drugs (last visited on March 18, 2014). Seroquel is used to treat certain mental or mood disorders. Id.

[15] Tizanidine is used to treat muscle spasms caused by certain condition. WebMD, http://www.webmd.com/drugs (last visited on March 18, 2014).

On November 24, 2010, plaintiff requested Vicodin and reported that her physical therapy did not help but that her TENS unit provided some relief.[16] She reported that she had been preparing to return to fulltime work. Dr. Tiede assessed status post C3-7 fusion and residual myofascial cervicalgia and recommended that she discontinue smoking but continue therapy. He also prescribed Vicodin. (Tr. 422-24.)

On December 7, 2010, plaintiff complained of hives, cough, and right hip pain. Dr. Chase assessed somatic dysfunction in the pelvic region, rash, and sinusitis. She performed osteopathic manipulation to the hip and prescribed Benadryl, Zithromax, and Proventil. (355-57.)

On December 10, 2010, plaintiff complained of blurry vision, light sensitivity, itching, and loss of vision. (Tr. 326-27.)

On December 14, 2010, plaintiff complained of sore throat, cough, and runny nose. Dr. Chase assessed postnasal drip and fatigue. (Tr. 352-54.)

On December 20, 2010, a cervical spine CT scan revealed marked improvement with disc bulging at C4-C7, bilateral neural foramina at C5-C6, and bony neuroforaminal change at C5-C6. (Tr. 333-34.)

On February 11, 2011, plaintiff reported that a brace helped her left knee as she waitressed but that she quit her job. Patrick A. Smith, M.D., observed tenderness but a full range of motion. He recommended an MRI scan and discussed surgery. She also complained of elbow joint pain, and Dr. Smith provided her with a brace. (Tr. 396.)

On February 15, 2011, plaintiff saw Dr. Chase for wellness examination. Dr. Chase assessed sinusitis, irritable bowel syndrome, and somatic dysfunction of the rib cage. She prescribed Augmentin and recommended application of the TENS unit to the rib cage. (Tr. 349-51.)

On March 1, 2011, plaintiff underwent an arthroscopy of the left knee, chondroplasty of the medial femoral condyle and patella, and medial plica synovectomy. Dr. Smith found that plaintiff had a medial meniscus tear. He further found degenerative change and pathologic plica and indicated that the degeneration could cause further problems. However, he opined that the

---

[16] TENS, or transcutaneous electrical nerve stimulation, is a back pain treatment that uses low voltage electric current to relieve pain. WebMD, http://www.webmd.com/drugs (last visited on March 18, 2014).

procedure improved her condition and recommended that she continue wearing a knee brace.  (Tr. 396-98.)

On March 3, 2011, plaintiff received physical therapy for her knee.  Paul Lane, PT, recommended a home exercise program and assessed knee pain and swelling, altered gait, decreased quadriceps strength, and limited range of motion.  (Tr. 443-44.)

On March 7, 2011, plaintiff received physical therapy for her knee.  She reported that she worked part-time as a singer and that she could walk without much pain or swelling.  Paul Lane recommended  that she continue her home exercise program.  (Tr. 445.)

On March 11 and March 16, 2011, plaintiff arrived at the Columbia Orthopaedic Group for status post left knee arthroscopy with chrondoplasty and plica synovectomy.  (Tr. 442, 446.)

On March 16, 2011, plaintiff reported some swelling but improvement since her knee surgery.  Dr. Smith recommended that continue use of the knee brace and physical therapy.  He opined that she might require a knee replacement in a few years.  (Tr. 490.)

On March 22, 2011, plaintiff complained of chronic neck pain but that it had improved to the point that she considered it a minor problem.  She reported daily TENS unit use on her neck.  She further complained about the left knee and requested further physical therapy.  D. Joseph Meyer, M.D., assessed status post C3-C7 fusion, residual myofascial cervicalgia, and chronic pain disorder.  Dr. Meyer continued her on tizanidine and recommended further physical therapy.  He also noted that she could freely move her arms and legs and described her gait and stance as normal.  (Tr. 425-27.)

On March 24, 2011, plaintiff complained of severe pain in the neck and right shoulder and lesser pain in the left shoulder.  She reported that she avoided lifting and looking up or down and that rotating and bending to the left caused pain.  She also reported spinal pain with overhead reaching.  Physical therapist Lane assessed cervical pain, muscle spasm, limited upper arm and shoulder function to due cervical pain, and limited cervical range of motion.  (Tr. 534-35.)

On March 29, 2011, plaintiff received physical therapy on her neck and back.  (Tr. 440.)

On April 1, 2011, plaintiff received physical therapy on her neck, back, and knee.  (Tr. 530-32.)

On April 20, 2011, Alan Aram, Psy.D., submitted a Psychiatric Review Technique form regarding plaintiff.  He found that plaintiff had the medically determinable impairment of anxiety

but that the impairment was not severe. He also found that plaintiff had mild limitation with restriction with daily living activities, social functioning, and difficulties maintaining concentration, persistence, and pace. (Tr. 451-62.)

On May 2, 2011, plaintiff received physical therapy on her neck, back, and shoulders. (Tr. 525.)

On May 4, 2011, Dr. Cunningham noted degenerative changes at C7-T1 and that prosthesis at C6-C7 had begun to collapse. He also noted a limited range of motion regarding the neck. He discussed additional spinal surgery and prescribed tramadol.[17] (Tr. 489.)

On June 2, 2011, plaintiff complained of bilateral cervical and shoulder pain and received physical therapy. Physical therapist Lane noted that plaintiff's insurance covered only two additional sessions. (Tr. 523.)

On June 8, 2011, plaintiff complained of cough and congestion. Dr. Burchett assessed tobacco use disorder, turbinate hypertrophy, and atypical pneumonia and prescribed Zithromax. (Tr. 609-12.)

On July 22, 2011, Corrie Willis, MSN, submitted a psychiatric evaluation regarding plaintiff. Plaintiff reported the following. She is forty-six years old and married with two children. She has no coping skills. She had worked since age fifteen and had most recently worked as a singing waitress. She left school during tenth grade but obtained her GED in 1995. She has trouble sleeping and is often irritable. She is depressed, anxious, overwhelmed, and has racing thoughts. She struggles with her children. Nurse Willis assessed major depression with

---

[17] Tramadol is used to relieve moderate to moderately severe pain. WebMD, http://www.webmd.com/drugs (last visited on March 18, 2014).

anxiety and chronic pain and gave a GAF of 50.[18]  Nurse Willis prescribed Ability and Cymbalta and recommended that she continue Xanax.[19]  (Tr. 620-22.)

On July 29, 2011, plaintiff reported improved sleep.  Nurse Willis observed low mood, anxiety, irritability, but good judgment.  (Tr. 623.)

On August 6, 2011, plaintiff reported improvement with pain and that she felt calmer.  Nurse Willis observed improvement with low mood and irritability and also good judgment and appropriate insight.  (Tr. 624.)

On August 10, 2011, plaintiff followed up on sinusitis.  Dr. Burchett assessed tobacco use disorder, headache, and muscle tension.  (Tr. 613-15.)

On September 2, 2011, plaintiff arrived at the emergency room, complaining of a fall at the grocery store that injured her right shoulder, right hand, left shoulder, left knee, and neck.  X-rays of the left knee and right hand revealed no abnormalities.  X-rays of the right shoulder revealed chronic degenerative changes.  X-rays of the cervical spine revealed anterior cervical place fusion from C3-T1 without fracture and bony spurring in the neuroformina at C6-T1.  (Tr. 505-18.)

On September 6, 2011, X-rays of the right ribs revealed degenerative changes of the acromioclavicular joint but no acute fracture.  (Tr. 504.)

On September 9, 2011, Paul Lane discharged plaintiff from physical therapy, finding that her condition had plateaued with decreased muscle spasms but recommended that she continue a home exercise program.  He noted that she attended eleven sessions, cancelled ten sessions, and did not show for one session.  Plaintiff reported that she felt unable to work.  (Tr. 524.)

---

[18] A GAF score, short for Global Assessment of Functioning, helps summarize a patient's overall ability to function. A GAF score has two components. The first component covers symptom severity and the second component covers functioning. A patient's GAF score represents the worse of the two components.

A GAF score from 41 to 50 represents serious symptoms (such as thoughts of suicide, severe obsessional rituals, frequent shoplifting), or any serious impairment in social, occupational, or school functioning (such as the inability to make friends or keep a job). American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, 32–34 (4th ed. 2000).

[19] Cymbalta is used to treat depression and anxiety.  WebMD, http://www.webmd.com/drugs (last visited on March 18, 2014).  Abilify is used to treat certain mental or mood disorders and depression.  Id.

On September 13, 2011, Dr. Meyer diagnosed status post C3-C7 fusion, residual myofascial cervicalgia, chronic pain disorder, and cervical post-laminectomy pain syndrome. He referred her to physical therapy and emphasized the development of a home exercise program for core strengthening and posture. (Tr. 501.)

On September 14, 2011, plaintiff received physical therapy but declined to perform exercises due to pain. Plaintiff reported an improved condition following physical therapy but continued to feel pain and had not returned to work. She complained of cervical pain, trapezius pain, and parascapular pain. She reported that she walked but performed no home exercise program. Paul Lane described her cervical, lumbar, and thoracic range of motion as functional but her shoulder range of motion as limited. (Tr. 499-500.)

On September 17, 2011, plaintiff reported that she felt happy and productive and that she slept soundly. She further reported that her pain had improved. Nurse Willis continued her on Cymbalta and Abilfy. (Tr. 625.)

On September 19, 2011, plaintiff complained of right shoulder pain, neck pain, and arm pain due to her recent fall. She wore a brace on her left knee. Dr. Smith opined that plaintiff tore her rotator cuff and recommended a shoulder MRI. He prescribed Vicodin. (Tr. 487-88.)

On September 22, 2011, a right shoulder MRI scan revealed diffuse tendinosis, abnormal supraspinatus and infraspinatus tendon with probable partial high-grade tear of the supraspinatus bursa, subacromial and subdeltoid bursitis, abnormal bicep tendon with tears and possible tendinosis, and acromioclavicular joint hypertrophy with impaction. (Tr. 486.)

On October 3, 2011, plaintiff complained of low back pain due to her fall in September. Physician assistant Wildman recommended X-rays and MRIs. (Tr. 485.)

On October 4, 2011, Dr. Smith informed plaintiff that she had an impingement due to acromioclavicular joint degenerative change and significant tendonopathy. He recommended surgery to repair the rotator cuff and biceps. (Tr. 484.)

On October 12, 2011, plaintiff complained of low back pain but reported that she had no leg pain. Dr. Cunningham told plaintiff to return if the pain increased in severity. (Tr. 483.)

On January 27, 2012, plaintiff complained of depression, irritability, and anxiety. Nurse Willis increased the dosage of Cymbalta. (Tr. 631.)

On February 25, 2012, plaintiff complained of irritability and negative thinking. Nurse Willis decreased the dosage of Cymbalta and increased the dosage of Abilify. (Tr. 630.)

On March 24, 2012, plaintiff complained of increased pain, depression, and irritability. (Tr. 629.)

**ALJ Hearing**

The ALJ conducted a hearing on December 19, 2011. (Tr. 25-77.) Plaintiff testified to the following. She became disabled on April 6, 2010, after surgery. She lives in a one-story house with her spouse and her four-year-old granddaughter, who has lived with them for one year. She has a driver license and drove to the hearing that day. The drive was sixty miles, and she stopped halfway for five minutes to walk. She completed the tenth grade and obtained her GED. She measures five feet, six and a half inches, and one hundred ninety pounds. She recently gained thirty pounds due to inability to exercise. (Tr. 30-31.)

Since April 2010, she has worked on only five occasions by singing for an hour at a time at homecomings and Christmas events. Each occasion caused her pain, but she enjoys singing. She worked at restaurant last year from August to December, waitressing for one five-hour shift per week. Each shift left her in extreme pain, and her boss dismissed her due to the pain. She receives unemployment benefits and has looked for work at restaurants and grocery stores. She cannot work due to pain. She has worked primarily as a waitress. She also worked fulltime for six years as a secretary for a home construction building about ten years ago. As a secretary, she ordered supplies, managed the payroll, performed computer work, and checked job sites. (Tr. 32-36.)

She has pain in her shoulders and neck that radiates to her head and causes headaches. Accordingly, she cannot perform repetitious conduct and cannot sit or stand for long periods of time. The pain in her neck is 7 of 10. To alleviate pain, she uses a TENS unit, takes tramadol, and undergoes physical therapy. The pain occurs daily and wakes her. She currently takes Vicodin for her shoulder and also took Vicodin after surgery for three or four months. Walking, standing, sitting for long periods, sleeping in certain positions, and housework cause neck pain. Hot baths, hot pads, and changing positions alleviate her pain. Dr. Cunningham informed her that

he did not think she could work in December of last year.  She was released to return to work in July 2010, but her former employer refused to rehire her.  (Tr. 36-39.)

She fell on a slick spot and hurt her shoulder on September 2.  She has a ninety-five percent rotator cuff tear and pulled her bicep away from the bone.  She had surgery last November but continues to have neck pain.  She must wear a shoulder brace until the next day.  She sees Patrick Smith for her shoulder, and he expects her to recover fully.  (Tr. 39.)

She had left knee surgery in March 2011.  She cannot walk long distances without her knee brace, or knee degeneration will require her to obtain a knee replacement.  She has not walked long distances since surgery.  She wore a knee brace after surgery until July 2011 and currently wears it occasionally, including when she shops.  Her knee causes her dull, aching pain about twice per week that lasts two hours.  For the knee pain, she takes tramadol.  Heat also alleviates the pain.  (Tr. 40-41.)

She also suffers depression due to chronic pain, which affects her focus, motivation, and ability to sleep.  The depression began after the April 2010 surgery.  Since June 2011, she has taken Cymbalta and Abilify and received counseling, and they are somewhat helpful.  When she began counseling, she attended weekly but currently goes every three months.  (Tr. 42-43.)

On a typical day, she falls asleep between 1:00 a.m. and 4:00 a.m. in the morning.  Pain, medications, and anxiety prevent her from sleeping.  She awakens between 4:00 a.m. and 8:00 a.m.  She feeds her granddaughter pop tarts and cleans the house.  She remains home on most days.  She cooks but preparing large meals is difficult due to pain.  She cannot care for the farm, mow, care for animals, or ride horses or four-wheelers as she once could also due to pain since her 2010 surgery.  She can care for her granddaughter because her granddaughter is fairly independent, and she also receives assistance with childcare from her granddaughter's parents, her spouse, and two friends.  Her spouse cares for her granddaughter in the evenings, and the others care for her granddaughter three or four days per week.  Her spouse works fulltime.  She cleans with a very small vacuum cleaner, prepares small meals, and dusts.  Her spouse assists her with laundry.  With her granddaughter, she reads books, watches television, and plays games.  She also walks with her outside but does not take her other places due to pain.  She sings as a hobby.  Her friend visits her nearly every day.  She attends church but not every week due to the length of the services and the inability to sit long periods of time.  (Tr. 43-47.)

She can sit for fifteen to twenty minutes before she must stand or walk. She can sit for two and one-half hours per eight-hour workday. She can stand for fifteen to twenty continuous minutes and can stand for three and one-half hours per workday. She can walk one-half mile. Before the shoulder injury, she could lift twenty pounds. Repetitious hand work, including writing or typing, is difficult. On the computer, she uses Facebook and search functions. Her spouse has managed the bills since April 2010. (Tr. 47-49.)

She can lift a bucket of water but only once per day due to pain in her shoulders that radiates to her neck and head. She has two or three headaches per week that last for up to two days. The headaches occur throughout the day and night. She takes Tylenol, lies down, takes hot showers, and uses a heating pad on her neck for an hour at a time. The neck pain and headaches are related. She takes tramadol for both neck and knee pain. She received three six week courses and one four-week course of physical therapy, which her insurance covered. Physical therapy alleviates her pain temporarily. In August 2010, she began using the TENS unit, which stimulates an area but does not relieve the pain. She had more frequent headaches before the surgery. Washing dishes and cooking aggravate the neck pain. She can wash dishes for only ten minutes, but her spouse finishes the chore. She washes dishes three times per day. (Tr. 49-55.)

After her July 2010 release to return to work, she worked at a diner to wait tables from August to December. She could not carry the five-pound trays or plates, which the job required her to do five times per shift. She could only carry two five-pound plates at once. She covered about twenty tables per shift. Carrying objects caused her pain. Her employer terminated her employment due to complaints from others about her pain and knee brace. She worked only one day per week due to pain. (Tr. 56-58.)

She could not return to work as a secretary due to her inability to sit, stand, write, or type for long periods of time. She lies and uses a heating pad during the day due to pain every three or four hours for an hour at a time. Her granddaughter can independently dress, eat, use the restroom, bathe, and go to bed. She wakes her granddaughter and instructs her on when to dress, the location of food, and the letters of the alphabet. She also runs her granddaughter's bath water. Her level of depression remains the same from day to day. Chronic pain, the inability to work, her weight, the inability to keep house and care for her family, and loss of consortium cause her depression. (Tr. 58-61.)

She lifted buckets of water for dogs, which she did about once per month. Tramadol does not alleviate her pain, and she has informed her doctors of its ineffectiveness. Neck surgery did not improve her neck pain. When she sings for pay, she stands but also has the option to sit or walk. She last sang on December 3. Injections also did not alleviate her neck pain. The heating pad most effectively alleviates her pain. (Tr. 62-65.)

Vocational Expert (VE) Gary Weimholt also testified at the hearing. Plaintiff's past work includes positions as waitress, which is semiskilled, light work; dining room manager, which is medium work; and secretary, which is skilled work. (Tr. 67.)

The ALJ presented a hypothetical individual of plaintiff's age, education, and experience that could perform light work but could only frequently handle with her upper extremities; could only occasionally climb ramps and stairs, balance, stoop, kneel, crouch, crawl, and reach above the shoulders; and could never climb ladders, ropes, or scaffolds. The individual must also avoid concentrated exposure to extreme cold and vibration. The VE replied that such an individual could perform plaintiff's past work as a waitress and secretary. (Tr. 68.)

The ALJ then limited the individual to sedentary work. The VE replied that such individual could perform plaintiff's past work as a secretary. The ALJ then altered the hypothetical individual by requiring a sit/stand option. The VE replied that such individual could perform in some secretary jobs, including as a medical secretary, which has 1,000 positions in Missouri and 50,000 nationally, and school secretary, which is sedentary work with 1,000 positions in Missouri and 50,000 nationally. Such individual could also perform as an information clerk, which has 1,200 sedentary positions in Missouri and 60,000 positions nationally, and booth cashier, which has 1,200 sedentary positions in Missouri and 60,000 nationally. The ALJ then altered the hypothetical individual, stating that the individual would be off task for twenty percent of the day. The VE replied that such an individual could perform no work. (Tr. 68-73.)

Plaintiff's counsel presented a hypothetical individual who required a one-hour break every three to four hours. The VE replied that such individual could perform no work. Plaintiff's counsel then stated that the individual would miss work two to three times per week. The VE replied that such individual could perform no work. Plaintiff's counsel then stated that the

individual could not perform repetitive reaching. The VE replied that such individual would be precluded from cashiering and work as a secretary. (Tr. 73-75.)

### III. DECISION OF THE ALJ

On January 23, 2012, the ALJ found plaintiff not disabled. (Tr. 10-20.) At Step One of the prescribed regulatory decision-making scheme,[20] the ALJ found that plaintiff had not engaged in substantial gainful activity since the alleged onset date, April 6, 2010. At Step Two, the ALJ found that plaintiff's severe impairments were degenerative disc disease, status post C3-7 fusion with residual myofascial cervicalgia, degenerative left knee arthritis, status post left knee arthroscopy with chondroplasty, and patella plica excision for knee pain and contracture. (Tr. 12.)

At Step Three, the ALJ found that plaintiff had no impairment or combination of impairments that met or was the medical equivalent of an impairment on the Commissioner's list of presumptively disabling impairments. (Tr. 15.)

The ALJ considered the record and found that plaintiff had the residual functional capacity (RFC) to perform light work; that she can frequently handle objects with both upper extremities; she can only occasionally climb ramps or stairs, balance, stoop, kneel, crouch, crawl, and reach above her shoulders; but she can never climb ladders, ropes, or scaffolding. He further found that she must avoid concentrated exposure to extreme cold and vibration. At Step Four, the ALJ determined that plaintiff could perform her past relevant work as a waitress and secretary. (Tr. 15-19.)

### IV. GENERAL LEGAL PRINCIPLES

The court's role on judicial review of the Commissioner's decision is to determine whether the Commissioner's findings comply with the relevant legal requirements and are supported by substantial evidence in the record as a whole. Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009). "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Id. In determining whether the evidence is substantial, the court considers evidence that both supports and detracts from the Commissioner's decision. Id. As long as substantial evidence supports the

---

[20] See below for explanation.

decision, the court may not reverse it merely because substantial evidence exists in the record that would support a contrary outcome or because the court would have decided the case differently. See Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002).

To be entitled to disability benefits, a claimant must prove she is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months. 42 U.S.C. §§ 423(a)(1)(D), (d)(1)(A); Pate-Fires, 564 F.3d at 942. A five-step regulatory framework is used to determine whether an individual is disabled. 20 C.F.R. § 404.1520(a)(4); see also Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987) (describing the five-step process); Pate-Fires, 564 F.3d at 942 (same).

Steps One through Three require the claimant to prove (1) she is not currently engaged in substantial gainful activity, (2) she suffers from a severe impairment, and (3) her disability meets or equals a listed impairment. 20 C.F.R. § 404.1520(a)(4)(i)-(iii). If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to Steps Four and Five. Step Four requires the Commissioner to consider whether the claimant retains the RFC to perform her past relevant work (PRW). Id. § 404.1520(a)(4)(iv). The claimant bears the burden of demonstrating she is no longer able to return to her PRW. Pate-Fires, 564 F.3d at 942. If the Commissioner determines the claimant cannot return to her PRW, the burden shifts to the Commissioner at Step Five to show the claimant retains the RFC to perform other work that exists in significant numbers in the national economy. Id.; 20 C.F.R. § 404.1520(a)(4)(v).

## V. DISCUSSION

Plaintiff argues that the ALJ erred by: (1) improperly evaluating plaintiff's credibility; (2) failing to find that her anxiety and depression were severe impairments; and (3) failing to support the RFC determination with evidence.

## A. Credibility

Plaintiff argues that the ALJ erred by improperly evaluating plaintiff's credibility. Specifically, plaintiff argues that the ALJ erroneously placed significant weight on her ability to

perform basic activities and her receipt of unemployment benefits and failed to consider plaintiff's persistent efforts to obtain treatment.

To evaluate a claimant's subjective complaints, the ALJ must consider the Polaski factors: (1) the claimant's daily activities; (2) the duration, frequency, and intensity of the condition; (3) dosage, effectiveness, and side effects of medication; (4) precipitating and aggravating factors; and (5) functional restrictions." Wildman v. Astrue, 596 F.3d 959, 968 (8th Cir. 2010). The ALJ may also consider inconsistencies in the record as a whole. Id. "[Courts] defer to an ALJ's credibility finding as long as the ALJ explicitly discredits a claimant's testimony and gives a good reason for doing so." Id.

The ALJ considered plaintiff's statements that she attended church, watched television, sat on her front porch, sang, used a computer, walked on her farm, prepared food, performed household chores, shopped, and drove. (Tr. 18.) He also considered her recent custody of her granddaughter as motivation for her disability benefits application and her receipt of unemployment benefits. (Tr. 19.) Although the Eighth Circuit has noted that unemployment benefits and the ability to perform basic activities alone are generally insufficient to discredit claimants or to support findings of no disability, the Eighth Circuit has upheld these considerations as valid. Medhaug v. Astrue, 578 F.3d 805, 817 (8th Cir. 2009); Reed v. Barnhart, 399 F.3d 917, 923 (8th Cir. 2005); Cox v. Apfel, 160 F.3d 1203, 1208 (8th Cir. 1998); Jernigan v. Sullivan, 948 F.2d 1070, 1074 (8th Cir. 1991).

Moreover, the ALJ found that the medical records noted significant improvement following the May 2010 cervical spine surgery. For instance, in October 2010, plaintiff reported improved pain. (Tr. 419-21.) The December 2010 cervical spine CT revealed marked improvement with the cervical spine. (Tr. 333-34.) In March 2011, plaintiff again reported improved neck pain, and Dr. Meyer noted, "[S]he considers the neck pain to be a minor problem." (Tr. 425-27.) Dr. Meyer also stated that use of the TENS unit and tizanidine controlled the pain and found further medication management unnecessary. (Id.)

The ALJ similarly found significant improvement following the March 2011 knee surgery. For example, on March 7, 2011, plaintiff reported that she could walk without much pain or swelling. (Tr. 445.) On March 16, 2011, she reported some knee swelling but overall improvement. (Tr. 490.) On March 22, 2011, Dr. Meyer described her gait and stance as normal

and indicated that plaintiff could freely move her legs. (Tr. 425-27.) On August 6 and September 17, 2011, she reported that she was happy due to increased productivity and effective pain management. (Tr. 624-25.) On September 2, 2011, X-rays of the left knee revealed no fractures, dislocations, foreign bodies, or joint effusion. (Tr. 519.) On October 12, 2011, plaintiff reported that she never has leg pain. (Tr. 483.)

Plaintiff also argues that the ALJ failed to consider her persistent efforts of obtaining treatment. The persistency of a claimant's treatment efforts is a relevant credibility factor. Comstock v. Chater, 91 F.3d 1143, 1147 (8th Cir. 1996); Titles II & XVI: Evaluation of Symptoms in Disability Claims: Assessing the Credibility of an Individual's Statements, SSR 96-7P (S.S.A. July 2, 1996). However, the ALJ need not discuss every relevant credibility factor. See Wildman, 596 F.3d at 968. Nevertheless, the ALJ referenced numerous medical records, which document plaintiff's treatment history, throughout his opinion. In short, the court disagrees with plaintiff's allegation that the ALJ failed to consider the persistency of her treatment efforts.

Substantial evidence supports the ALJ's credibility determination. Accordingly, plaintiff's argument is without merit.

**B. Severe Impairments**

Plaintiff argues that the ALJ erred by failing to find that plaintiff's anxiety and depression were severe impairments. A severe impairment is defined as an impairment that significantly limits one's physical or mental ability to do basic work activities. 20 C.F.R. § 404.1520(c). "Severity is not an onerous requirement for the claimant to meet, but it is also not a toothless standard, and we have upheld on numerous occasions the Commissioner's finding that a claimant failed to make this showing." Kirby v. Astrue, 500 F.3d 705, 707-08 (8th Cir. 2007).

The ALJ supported his finding of non-severity with medical records. For example, he noted plaintiff's testimony that she received counseling only once every three months and her statements that she socialized regularly, attended social events twice per month, had no problems with authority figures, and could follow written and oral instructions, and that her employment had never been terminated for not getting along with others. (Tr. 42-43, 187-94.) On August 6, 2011, plaintiff reported that she felt calmer and nurse Willis observed good insight and judgment and improvement with plaintiff's mood and irritability. (Tr. 624.) On September 17, 2011, plaintiff reported that she felt happy and productive and that she slept soundly. (Tr. 625.) He also

considered the report of plaintiff's friend, Sarah A. Dombrowski, who stated that she visited plaintiff several times per week and spoke with her every day. (Tr. 198-205.) Ms. Dombrowski also stated that plaintiff attended church, spent time with her family, went to coffee shops with friends with full participation, and had no problems with family, friends, neighbors, or others. (Id.) Further, Dr. Burchett described plaintiff's level of consciousness, orientation, judgment, insight, memory, mood, affect, language, fund of knowledge, and capacity for sustained mental activity as normal. (Tr. 611.)

Additionally, the ALJ supported his finding regarding anxiety and depression with the opinion of Alan Aram, Psy.D., who found that plaintiff had only mild limitations with restriction with daily living activities, social functioning, and difficulties maintaining concentration, persistence, and pace. (Tr. 14 (Exh. 19F), 451-62.) A mild rating generally indicates non-severe mental impairments. Buckner v. Astrue, 646 F.3d 549, 557 (8th Cir. 2011); 20 C.F.R. § 404.1520a. Additionally, although plaintiff was diagnosed with anxiety and depression, mere diagnoses do not dictate a finding of severity. Buckner, 646 F.3d at 557 (8th Cir. 2011).

Accordingly, substantial evidence supports the ALJ's finding regarding anxiety and depression.

## C. RFC Determination

Plaintiff argues that the RFC assessment is conclusory and without rationale or reference to supporting evidence. "The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." Titles II & XVI: Assessing Residual Functional Capacity in Initial Claims, SSR 96-8P (S.S.A July 2, 1996). However, the ALJ need not provide a narrative discussion immediately following each statement of an individual limitation in the RFC if the court can otherwise discern the elements of the ALJ's decision-making. See Depover v. Barnhart, 349 F.3d 563, 567-68 (8th Cir. 2003).

Here, the ALJ referred to the record on numerous occasions in his lengthy discussion of severe impairments and the RFC determination. As set forth above, the ALJ supported his credibility and severity determinations with substantial evidence from the record, and such

evidence also supports the RFC determination.  Accordingly, plaintiff's argument is without merit.

## VI.  RECOMMENDATION

For the reasons set forth above, it is the recommendation of the undersigned that the decision of the Commissioner of Social Security be affirmed.

The parties are advised that they have 14 days to file written objections to this Report and Recommendation.  The failure to file timely written objections may waive the right to appeal issues of fact.

_____/s/ David D. Noce_____
**UNITED STATES MAGISTRATE JUDGE**

Signed on June 9, 2014.